UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 22-3232, 23-1405
_____

UNITED STATES OF AMERICA

v.

SOULEYMANE DIARRA, Appellant in 22-3232; MALAN DOUMBIA, a/k/a
"FRENCHIE", Appellant in 23-1405
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Nos. 2:19-cr-00392-001 and 002)
District Judge: Honorable Wendy Beetlestone
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
July 12, 2024

Before: SHWARTZ, PHIPPS, and MONTGOMERY-REEVES, *Circuit Judges*.

(Opinion filed: July 7, 2025)
_____

OPINION[*]
_____

MONTGOMERY-REEVES, *Circuit Judge*.

In this appeal, Malan Doumbia and Souleymane Diarra challenge certain

convictions and sentences relating to their participation in a credit and debit card fraud

scheme. They challenge the sufficiency of evidence supporting their aggravated identity

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

theft and wire fraud conspiracy convictions and related sentencing enhancements. And they argue that the District Court improperly instructed the jury on their money laundering conspiracy charge. They also argue that recent precedent requires vacating their aggravated identity theft convictions. Because sufficient evidence supports their convictions, the District Court's jury instructions were not plainly erroneous, and recent precedent does not require vacatur, we will affirm.

## I.      BACKGROUND

Doumbia's and Diarra's convictions stem from a fraud scheme that involved purchasing stolen credit and debit card numbers from the dark web and attempting to withdraw funds from those accounts. In 2015, following an investigation, the Secret Service executed search warrants of Doumbia's and Diarra's homes. During the search of Doumbia's home, investigators recovered various items allegedly used in the fraud scheme, including Western Union receipts, VISA gift cards, phones, laptops, altered gift cards, and an embossing machine. In the search of Diarra's home, investigators recovered evidence of stolen and fraudulent credit cards.

A grand jury returned a 9-count indictment charging Doumbia, Diarra, and Souleymane Jallow[1] with the following offenses: conspiracy to commit wire fraud ("Count 1"); counterfeit access device fraud and aiding and abetting ("Count 2" and "Count 3"); aggravated identity theft and aiding and abetting ("Counts 4, 5, 6, 7 and 8"); and conspiracy to commit money laundering ("Count 9").

---

[1]  Jallow has yet to be arrested and was not tried with Doumbia and Diarra.

At trial, another alleged co-conspirator, Fousseiny Camara, described how the scheme worked. He explained that Diarra purchased stolen credit cards from contacts in Ukraine, Russia, and Vietnam using bitcoin or Western Union.

These overseas contacts provided Diarra with victims' identifying information, including "name, address, social security, everything." App. 225. Diarra had another person use an embosser machine to affix those names and numbers onto empty credit cards, then Camara and others could make withdrawals from the accounts associated with the stolen numbers. Camara also testified that Diarra provided Doumbia with debit cards and associated pin numbers so that Doumbia could withdraw money directly from ATMs.

Following trial, a jury found Doumbia and Diarra guilty on all charges. At sentencing, the District Court found that the Government proved there were 22 victims, 17 people whose card numbers were found on Diarra's seized laptop and five banks. Under the United States Sentencing Guidelines, the District Court applied various enhancements to their sentences, including a 10-or-more victim enhancement, an overseas enhancement, a loss amount enhancement, and a money laundering enhancement. *See* U.S. Sent'g Guidelines Manual §§ 2B1.1(b)(2)(A)(i), (b)(10)(B), (b)(1)(D); 2S1.1(b)(2)(B) (U.S. Sent'g Comm'n 2022).

Ultimately, the District Court sentenced Doumbia to "a term of 62 months on each of Counts 1, 2, 3 and 9 to be served concurrently [and a] term of 24 months on each of counts 4, 5, 6, 7, [and] 8 to be concurrently to each other but consecutively to the terms imposed on Counts 1, 2, 3 and 9 to produce a total term of 86 months." App. 904. The District Court sentenced Diarra to "a term of 37 months on each of Counts 1, 2, 3 and 9

3

to be served concurrently and the term of 24 months on each of counts 4, 5, 6, 7 and 8 to be served concurrently to each other but consecutive to the terms imposed on counts 1, 2, 3 and 9 to produce a total term of 61 months of imprisonment."[2] App. 855.

Diarra moved for acquittal on all counts, and Doumbia moved for acquittal on the conspiracy to commit wire fraud and the aggravated identity theft counts. The District Court denied these motions.

Doumbia and Diarra now appeal.

## II.     DISCUSSION[3]

Doumbia and Diarra make four arguments on appeal: (1) *Dubin v. United States*, 599 U.S. 110 (2023), requires this Court to vacate their aggravated identity theft convictions; (2) insufficient evidence supports the aggravated identity theft and wire fraud conspiracy convictions; (3) the jury instructions for money laundering conspiracy were erroneous; and (4) the District Court erred by applying the 10-or-more victim, overseas, and loss amount sentencing enhancements. We address each issue in turn.

### A.     *Dubin v. United States*

Doumbia and Diarra argue that the recent Supreme Court decision in *Dubin* requires vacating their aggravated identity theft convictions. Not so.

---

[2] Doumbia and Diarra also were sentenced to identical terms of supervised release of three years on Counts 1, 2, 3, and 9 and a term of one year on each of Counts 4, 5, 6, 7, and 8, "such terms to run concurrently." App. 855. And they were ordered to pay restitution and a special assessment.

[3] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

Dubin was convicted of healthcare fraud and aggravated identity theft for overbilling Medicaid through a company he helped manage. *Dubin*, 599 U.S. at 114–15. The scheme involved inflating the services the company provided to real patients. *Id*. at 114. The Government argued that Dubin should be convicted of aggravated identity theft on top of his substantive healthcare fraud conviction because Dubin's "fraudulent billing included the patient's Medicaid reimbursement number (a 'means of identification')." *Id*. at 115.

But the Supreme Court held that a defendant should be convicted of aggravated identity theft only where "a defendant 'uses' another person's means of identification 'in relation to' a predicate offense when this use is at the crux of what makes the conduct criminal." *Id*. at 131. Under this framework, the Court vacated Dubin's aggravated identity theft conviction because the use of patient names was ancillary to the healthcare fraud scheme that was based on "misrepresenting *how* and *when* services were provided to a patient, not *who* received the services." *Id*. at 132. Although Dubin's scheme included the use of real identifying information, the "crux" of the underlying fraud was exaggerating the healthcare service, not using specific identities. *Id*.

Contrary to Doumbia's and Diarra's assertions, *Dubin* supports their aggravated identity theft convictions. Unlike in *Dubin,* the conduct at issue here, using "another person's identification information to get access to that person's bank account," is "classic identity theft." *Id*. at 126 (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 656 (2009)). Misrepresenting others' identities to creditors and banks is at the "crux of the underlying criminality," which is the bank and access fraud. *Id*. at 129.

5

Accordingly, *Dubin* does not require us to vacate Doumbia's and Diarra's aggravated identity theft convictions.[4]

### B. Sufficiency of Evidence Underlying the Aggravated Identity Theft and Wire Fraud Conspiracy Convictions

Doumbia and Diarra argue there is insufficient evidence to support their aggravated identity theft convictions. Doumbia also challenges his wire fraud conviction for the same reason. They argue the District Court erred in denying their motions for judgment of acquittal on these grounds. Fed. R. Crim. P. 29(c). We disagree.

In reviewing a district court's ruling on a post-verdict motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, "we consider whether the evidence, when viewed in a light most favorable to the government, supports the jury's verdict." *United States v. Fattah*, 914 F.3d 112, 182–83 (3d Cir. 2019). We must uphold the jury's verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 424–25 (3d Cir. 2013) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

"This is a 'particularly deferential standard of review.'" *United States v. Centeno*, 793 F.3d 378, 386 (3d Cir. 2015) (quoting *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998)). "We do not weigh evidence or determine the credibility of witnesses . . . ." *Id*. (quoting *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003)). "Thus, 'a

---

[4] Diarra's argument that 18 U.S.C. § 1028A(a)(1) is void for vagueness also fails. *See Dubin v. United States*, 599 U.S. 110, 132 n.10 (2023).

reviewing court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id*. (quoting *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam)).

### 1. Sufficient Evidence of Knowledge Supports Doumbia's Aggravated Identity Theft Convictions

Doumbia argues that there is insufficient evidence for his aggravated identity theft convictions because the evidence does not show that he knew the credit and debit cards purchased from the dark web belonged to real people.  Not so.

The statute criminalizing aggravated identity theft provides: "Whoever, during and in relation to any felony violation enumerated in subsection (c), *knowingly* transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."  18 U.S.C. § 1028A(a)(1) (emphasis added).  In *Flores-Figueroa v. United States*, the Supreme Court held that to satisfy the knowledge element of § 1028A(a)(1), the Government must prove "that the defendant knew that the means of identification at issue belonged to another person."  556 U.S. at 657.  "[W]here a defendant has used another person's identification information to get access to that person's bank account, the Government can prove knowledge with little difficulty."  *Id*. at 656.

Here, investigators found evidence on Doumbia's phone that he had visited websites that sold stolen credit card numbers.  Investigators also found emails and texts

7

that contained detailed personal information, such as names, addresses, Social Security numbers, email addresses, and dates of birth. The fact that the dark web numbers provided other identifying information along with the card number indicates that Doumbia knew the card numbers belonged to real people. Investigators also found personal information of one of the named individual victims on Doumbia's laptop. Doumbia's participation in a debit and credit card fraud scheme would be pointless if this information was not associated with real peoples' accounts.

Applying the "particularly deferential standard of review," *Centeno*, 793 F.3d at 386 (quoting *Dent*, 149 F.3d at 187), we hold that the Government has cleared the bar required to show the requisite mens rea to convict Doumbia for aggravated identity theft. *Flores-Figueroa*, 556 U.S. at 656. Accordingly, we find no error in the District Court's denial of Doumbia's motion for judgment of acquittal on this basis.

### 2. Sufficient Evidence Supports Diarra's Aggravated Identity Theft Convictions

Diarra contends that there was insufficient evidence for the jury to convict him of aggravated identity theft through aiding and abetting or *Pinkerton* theories of liability. We disagree.

As for aiding and abetting liability, Diarra argues that the District Court improperly found that he knew about and possessed the credit card numbers of the five victims named in the indictment because the evidence ties him only to the fraudulent use of other credit card numbers.

To show aiding and abetting liability under 18 U.S.C. § 2(a), "the Government must prove: '(1) that another committed a substantive offense; and (2) the one charged with aiding and abetting knew of the commission of the substantive offense and acted to facilitate it.'" *Centeno*, 793 F.3d at 387 (quoting *United States v. Mercado*, 610 F.3d 841, 846 (3d Cir. 2010)). "There must, however, be more than association with individuals involved in the criminal venture." *Id.* (internal quotation marks and alterations omitted). "A defendant is not guilty of aiding and abetting an offense unless the defendant 'did something to forward the crime and . . . was a participant rather than merely a knowing spectator.'" *Id.* (quoting *United States v. Dixon*, 658 F.2d 181, 189 (3d Cir. 1981)). "[O]nly some affirmative participation which at least encourages the principal offender to commit the offense is required." *Id.* (internal quotation marks omitted) (quoting *United States v. Frorup*, 963 F.2d 41, 43 (3d Cir. 1992)); *see also Rosemond v. United States*, 572 U.S. 65, 74 (2014) ("The division of labor between two (or more) confederates thus has no significance: A strategy of 'you take that element, I'll take this one' would free neither party from liability.").

Diarra does not dispute that Doumbia committed aggravated identity theft, the substantive offense. *Centeno*, 793 F.3d at 387. Thus, the only remaining issue is whether there was sufficient evidence from which a rational juror could find that Diarra aided and abetted this crime. *Id.*

Diarra was caught on tape multiple times referring to Doumbia's operations, including Doumbia's strategic use of credit card numbers to avoid detection from the FBI and observing that Doumbia's numbers worked. This evidence shows Diarra knew of the

9

fraudulent scheme. *Centeno*, 793 F.3d at 387. Further, Diarra facilitated Doumbia's fraud by sending Doumbia credit card information, indicating that Diarra encouraged Doumbia's commission of the crime. *Id*. Thus, applying the "particularly deferential standard of review," we cannot conclude that no rational juror could accept the evidence as sufficient to support Diarra's guilt beyond a reasonable doubt. *Centeno*, 793 F.3d at 386; *Fattah*, 914 F.3d at 162.

For the foregoing reasons, we will affirm the District Court's denial of Diarra's motion for judgment of acquittal as to the aggravated identity theft convictions.[5]

### 3. Sufficient Evidence Supports Doumbia's Conviction for Conspiracy to Commit Wire Fraud

Doumbia alone asks us to reverse his conviction for conspiracy to commit wire fraud, arguing that the Government presented insufficient evidence to establish that he had a relationship with Diarra or that he entered an agreement with Diarra to engage in criminal behavior. To support this argument, Doumbia argues that Camara—a cooperating Government witness who Doumbia asserts did not know him—offered the bulk of evidence at trial and that the evidence was not overwhelming. Doumbia's arguments fail.

The statute criminalizing wire fraud conspiracy provides that "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the

---

[5] Because we are affirming Diarra's aggravated identity theft convictions under the aiding and abetting theory of liability, we need not address Diarra's *Pinkerton* argument.

object of the attempt or conspiracy." 18 U.S.C. § 1349. To prove the existence of a conspiracy, "the Government must show (1) a shared unity of purpose, (2) an intent to achieve a common illegal goal, and (3) an agreement to work toward that goal . . . ." *United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010). Conspiracies can be shown from entirely circumstantial evidence. *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005) ("Indeed, the very nature of the crime of conspiracy is such that it often may be established only by indirect and circumstantial evidence."). But "[c]ircumstantial inferences drawn from the evidence must bear a logical or convincing connection to established fact." *Caraballo-Rodriguez*, 726 F.3d at 425 (quotation marks omitted). And "there must be evidence tending to prove that [Doumbia] entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment." *United States v. Schramm*, 75 F.3d 156, 159 (3d Cir. 1996) (quoting *United States v. Scanzello*, 832 F.2d 18, 20 (3d Cir. 1987)). Further, the Government's evidence must be individual and personal to a defendant. *Boria,* 592 F.3d at 480.

Circumstantial evidence shows Doumbia's involvement in the conspiracy. Numerous WhatsApp messages shared between Doumbia and Diarra exchanging identifying information show "a shared unity of purpose." *Boria*, 592 F.3d at 481; Supp. App. 115–20. These conversations also evidence "an agreement to work toward that goal," *Boria*, 592 F.3d at 481, where Doumbia and Diarra exchange information to aid in the facilitation of the other person's fraud.

Camara's testimony evidences Doumbia's and Diarra's "intent to achieve a common illegal goal." *Id*. For example, Camara explained: Diarra would "send me a

credit card on my phone, on my computer or in the mail, or sometime [sic] he come to my house to take an empty card and put my name on it and number and give it to me, so I can work and come back. . . . [A]nd after setting everything we share, they might take 60 percent sometimes." App. 188. He also explained that Diarra would give certain numbers "just to [Doumbia]" so that Doumbia could "go to ATM machine [sic] to withdraw money." App. 195. Further, Diarra explained to Camara in wiretapped conversations how Doumbia would "wait for about six months before using [credit card numbers] so they don't trace them and know their origin." App. 224.

Also, police discovered 340 emails with victim credit card information on Doumbia's phone. Where conspiracies can be shown "entirely by circumstantial evidence," *Brodie*, 403 F.3d at 134[6], we cannot conclude that no rational juror could accept the evidence as sufficient to support the conclusion of Doumbia's guilt beyond a reasonable doubt. *Fattah*, 914 F.3d at 183. Thus, we will affirm the District Court's order denying Doumbia's motion for judgment of acquittal on his wire fraud conspiracy conviction.

### C.      Jury Instructions for Money Laundering Conspiracy

Doumbia and Diarra challenge before us aspects of the District Court's jury instructions for conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). App. 73–74. Because they did not raise these objections before the trial court,

---

[6] For this reason, we are unpersuaded by Doumbia's argument that Camara's testimony cannot account for a certain portion of the evidence used to convict him. Further, at this stage, we do not weigh the credibility of witnesses. *Centeno*, 793 F.3d at 386.

we review for plain error. *United States v. Bruce*, 950 F.3d 173, 175 (3d Cir. 2020).[7]

Although the District Court did misspeak at different points of its instructions, when read

"as a whole," *United States v. Repak*, 852 F.3d 230, 255 (3d Cir. 2017) (quoting *United*

*States v. Flores*, 454 F.3d 149, 157 (3d Cir. 2006)), and "consider[ing] the totality of the

instructions and not a particular sentence or paragraph in isolation[,]" *United States v.*

*Coyle*, 63 F.3d 1239, 1245 (3d Cir. 1995), we cannot say that the District Court

committed reversible error.

First, although the indictment charged a conspiracy with two illegal objects—

international promotional money laundering (in violation of 18 U.S.C. § 1956(a)(2)(A))

and international concealment money laundering (in violation of *id*. § 1956(a)(2)(B)(i))—

App. 73-74, the District Court twice mistakenly stated that the object of the conspiracy

was "wire fraud," not "money laundering," App. 682. These misstatements do not

compel reversal, however, because they did not affect the Doumbia's and Diarra's

substantial rights. In fact, the instructions stated on 13 occasions that they concerned

"money laundering." *See* App. 680–84. Moreover, the verdict sheet labeled Count Nine

"Conspiracy to Commit Money Laundering, International Promotion and Activity to

---

[7] In reviewing for plain error, "we must decide whether (1) an error occurred, (2) the error is 'plain,' and (3) it 'affect[s] substantial rights.'" *United States v. Payano*, 930 F.3d 186, 192 (3d Cir. 2019) (alterations in original) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). "For an error to affect a defendant's substantial rights, it must have 'prejudiced [him], either specifically or presumptively,' i.e., '[i]t must have affected the outcome of the district court proceedings.'" *Id*. (quoting *Olano*, 507 U.S. at 734, 739). If these conditions are met, "a court of appeals should exercise its discretion to correct the error if it would 'seriously affect[] the fairness, integrity or public reputation of judicial proceedings.'" *Id*. (quoting *Olano*, 507 U.S. at 732).

Conceal or Disguise Funds Obtained from Wire Fraud Activities," which made clear the object of the conspiracy. App. 767, 769. Additionally, at the beginning of the trial, the District Court explained that the indictment charged Doumbia and Diarra with "conspiracy to launder monetary instruments," App. 130, and reviewed the elements of promotional money laundering under § 1956(a)(2)(A) without referencing wire fraud as an object of the charged conspiracy, *see* App. 131–32. Read in totality, these instructions were sufficiently clear for the jury to understand the proper object of the conspiracy, and thus did not influence the outcome of the proceedings. Doumbia's and Diarra's substantial rights therefore were not affected.

Second, the District Court did not improperly advise the jury that it could convict based on either conspiracy to commit money laundering or the substantive offense of international promotional money laundering, and thus did not constructively amend the indictment. App. 682–83 (stating that to find the defendant guilty of conspiracy to commit money laundering the Government must provide that "Defendant either knowingly or conspired with others to transport, transmit or transfer monetary instruments or funds"). Constructive amendment occurs when the "jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." *United States v. Daraio*, 445 F.3d 253, 259–60 (3d Cir. 2006). To be sure, the District Court used incorrect language in a portion of this instruction. Read in its entirety, however, the instructions make clear that Doumbia and Diarra were charged with conspiracy, not a

14

substantive offense. The District Court, for example, explained at the onset: "[i]t is a federal crime for two or more persons to agree or conspire to commit money laundering, even if they never actually achieved that objective . . . ." App. 681. Therefore, this error did not so severely confuse the jury as to substantially affect Doumbia's and Diarra's rights.

Third, although Doumbia and Diarra contend that the jury instructions conflated the elements of international promotional money laundering, *see* 18 U.S.C. § 1956(a)(2)(A), with international concealment money laundering, *id*. § 1956(a)(2)(B)(i), and more specifically that the District Court seemed to add as an element an intent "to conceal or disguise" as another basis to improperly convict them for the offense of promotional money laundering, *see* Diarra Br. at 31, the instructions clearly convey that there were two different types of money laundering (promotion and concealment) charged as objects of the conspiracy. App 73–74. For example, moments before the complained-of verbiage, the District Court informed the jury of the indictment's two objects. *See* App. 680–81.[8] Its choice to restate the elements of both objects in one

---

[8] Diarra also asserts that this instruction permitted the jury to convict him for either promotion or concealment on account of his conspiring to transfer of funds (irrespective of whether such funds were proceeds), emphasizing that the offense of concealment requires the transfer of "proceeds," whereas the offense of promotion covers the transfer of any funds. *Compare* 18 U.S.C. § 1956(a)(2)(B)(i) *with* (a)(2)(A). Even if the District Court conflated this distinction, Diarra fails to explain how this purported error affected his substantial rights. Given the strength of the Government's evidence of concealment of proceeds, use of the term "funds" instead of "proceeds" does not warrant reversal.

15

sentence rather than in two had no meaningful impact on the jury's ability to understand the charges and thus did not affect Doumbia's and Diarra's substantial rights.[9]

Fourth and finally, the evidence substantiates the money laundering charges and permits us to conclude that the jury would have reached the same conclusion had the District Court not made its semantic slip-ups. Accordingly, although the jury instruction was less than perfect, these issues do not amount to plain error, and thus reversal on this basis is not warranted.

### D. Sentence Enhancements

Doumbia and Diarra also challenge the District Court's application of three sentencing enhancements: (1) the 10-or-more-victim enhancement; (2) the loss-amount enhancement; and (3) the overseas-conduct enhancement. Because Doumbia and Diarra challenge the District Court's "application of the Guidelines to a specific set of facts," "the determination should be reviewed for clear error." *United States v. Caraballo*, 88 F.4th 239, 243–44 (3d Cir. 2023) (citing *United States v. Richards*, 674 F.3d 215, 219, 221 (3d Cir. 2012)). We therefore ask whether, "when reviewing the entire record, we are left with the definite and firm conviction that a mistake has been committed." *Id.* at 244 (internal quotation marks omitted).

---

[9] The District Court properly instructed the jury regarding the elements of concealment money laundering. The District Court expressly told the jury that one of the objects of the conspiracy was "to conceal or disguise the nature, location, source, ownership or control of the proceeds of the wire fraud activity, specifically wire fraud" "knowing that the monetary instrument or funds represented the proceeds of some form of unlawful activity, and with the knowledge that the transactions were designed in whole and in part" for this purpose. *See* App. 681.

16

Doumbia and Diarra challenge the two-level enhancement under Sentencing Guideline 2B1.1(b)(2)(A)(i), which applied because the offense "involved 10 or more victims." Doumbia and Diarra also challenge the calculation of the loss amount for the six-level enhancement under Sentencing Guideline 2B1.1(b)(1)(D), which applied because the loss amount fell between $40,000 and $95,000. Doumbia and Diarra agree that five named individuals to the aggravated identity theft counts are victims under the 10-or-more victims enhancement. The question is whether the District Court clearly erred in finding that five banks lost $60,262.70, triggering both enhancements. It did not, so we will affirm.

At Diarra's sentencing hearing, Diarra's counsel facially made three distinct objections as to (1) whether the five banks may be considered victims; (2) whether the banks suffered $60,262.70 of loss; and (3) whether a link existed to tie the banks' alleged losses to Diarra. But a close review of the record reveals the true nature of Diarra's objections. In three separate exchanges, Diarra confirmed that his objections boiled down to the Government's failure to prove that Diarra intended to cause the $60,262.70 of loss that the banks incurred. *See, e.g.*, App. 822 (Diarra's counsel clarifying the "objection to the 60,000 because the Government still has not proven that that was an amount that the defendant sought, *the pecuniary amount that this defendant sought to inflict*" (emphasis added)). Read in context, Diarra objected not to the Government's failure to prove beyond a preponderance of the evidence that the banks suffered a loss of $60,262.70, but to the Government's failure to show that Diarra intended to inflict that loss. On appeal, Diarra abandons his direct-intent claim and instead focuses on the

17

Government's alleged failure to prove that the banks were victims under Sentencing Guideline 2B1.1(b)(2)(A)(i) and alleged failure to prove the loss amount of $60,262.70 under Sentencing Guideline 2B1.1(b)(1)(D). Both arguments fail because Diarra's statements at the sentencing hearing, read in context, appear to concede the existence of the loss amount and number of victims that make both enhancements applicable.[10] In short, after reviewing the entire record, we are not left with the definite and firm conviction that a mistake has been committed.[11]

The same is true for Doumbia. At his sentencing hearing, he appeared to agree that the banks were victims and that the banks lost around $60,000. App. 867 (The Court, asking "So accordingly the amount used in the fraud loss calculation would be $60,262.70, correct?" and defense counsel responding "Yes, Your Honor."). In fact, while a Secret Service agent was prepared to testify in-person about the banks,

---

[10] Even without concessions, the record supports the District Court's enhancement. With respect to the amount of loss, the focus is whether the amount found was foreseeable to Diarra, *see* U.S.S.G. § 2B1.1; *United States v. Gibbs*, 190 F.3d 188, 214–15 (3d Cir. 1999), and here it was based upon, among other things, the number of identities used to commit the crime and the reported losses. Furthermore, the record also supports a conclusion that more than ten individuals and/or entities sustained losses as a result of the scheme.

[11] We are mindful that the District Court had the benefit of presiding over the trial in this matter, and although we agree with the District Court's ultimate decision to apply the enhancements, we take this opportunity to clarify any confusion that arose at sentencing regarding permissible reliance on the presentence report. District courts are not permitted to rely solely on a disputed finding in a presentence report, without more, to determine whether an enhancement applies. *See United States v. Soto*, 122 F.4th 503, 508 (3d Cir. 2024). Instead, Federal Rule of Criminal Procedure 32(i)(3)(B) requires district courts to first "make express findings on disputed facts or to disclaim reliance thereon." *United States v. Dawson*, 32 F.4th 254, 268 (3d Cir. 2022).

Doumbia's counsel stated she did not "have any reason to doubt" what the agent's "testimony would be" and decided against "requiring the Government to call him." App. 868–69. Doumbia instead argued—like Diarra—that the loss to the bank victims was not "linked directly" to him. App. 868. Under these circumstances, we will affirm the application of both enhancements.

Finally, Doumbia and Diarra challenge the two-level enhancement under Sentencing Guideline 2B1.1(b)(10)(B), which applied because "a substantial part of [the] fraudulent scheme was committed from outside the United States." The District Court found that the stolen credit cards were received by purchasers from dark-web vendors located in, among other places, Russia and Ukraine. Where the stolen credit cards formed part and parcel to the offense, we find no clear error in the District Court's application of the enhancement.

## III. CONCLUSION

For the reasons discussed above, we will affirm Doumbia's and Diarra's convictions for Counts 1, 4–9, along with the 10-or-more victim, overseas, and loss amount enhancements.